JOURNAL ENTRY and OPINION
{¶ 1} Appellant Nicholas DiCello appeals the trial court's decision granting summary judgment in favor of Newport Harbor Association, Inc. ("Newport Harbor"). DiCello also appeals the jury's verdict to quiet title in favor of Newport Harbor. DiCello assigns the following issues for our review:
"I. Whether the trial court erred in granting Newport Harbor summary judgment on its claim for purposeful and malicious destruction of property?"
"II. Whether the trial court erred by including a jury instruction regarding the doctrine of caveat emptor as it does not apply to the underlying real estate transaction?"
"III. Whether the trial court erred by permitting Lozick to amend his pleadings during trial to include a trespass claim against DiCello and instructing the jury thereon?"
"IV. Whether the jury's punitive damage award was unreasonably disproportionate to the actual damages awarded as to Lozick's claim for trespass and lost profits?"
"V. Whether the jury erred in denying DiCello recovery on his claim for a violation of the Ohio Consumer Sales Practices Act, O.R.C. § 1345.02, given the evidence?"
"VI. Whether the trial court erred by granting unreasonable attorney fees given the evidence presented, the worked performed, and the results obtained."
 {¶ 2} Having reviewed the record and pertinent law, we reverse the decision of the trial court and remand for further proceedings consistent with this opinion. The apposite facts follow.
 {¶ 3} Newport Harbor is a successor in interest to Newport North Shore Development and holds interest and title to a marina and related harbor facilities located at the Newport Harbor, which is part of the Shoreby Club in Bratenahl, Ohio. Newport Harbor holds rights and title to this property pursuant to the Lake Erie Submerged Land Easement from the State of Ohio, Department of Natural Resources. Newport Harbor is a man-made lagoon containing approximately 117 boat slips ranging in size from thirty feet long by fourteen feet wide to 105 feet long by twenty-five feet wide.
 {¶ 4} In March 1993, appellant Nicholas DiCello purchased boat slip number three for $125,000. Contemporaneously with the slip purchase, DiCello entered into a lease agreement with Newport North Shore Development. Pursuant to the lease agreement, DiCello was entitled to eighty linear feet of dock space, together with an undivided, nonexclusive easement to use all the common areas in the boat basin. At the time of this purchase, DiCello alleged that he was told the dock was eighty feet by twenty-five feet.
 {¶ 5} At the time DiCello purchased boat slip three, he owned a Sea Ray boat that measured sixty-three feet by fifteen feet. However, in March 2002, Dicello had a custom-made yacht, known as a Mangusto, specially manufactured for him in Italy. The new yacht measured approximately eighty feet by twenty feet.
 {¶ 6} When the yacht arrived, DiCello had difficulty docking the yacht. DiCello's captain measured the basin between the finger dock walkway and the guide poles[1] separating slip three and slip two. DiCello discovered that the width was twenty-three feet, not the twenty-five feet, which he claimed he was told at the time of the purchase agreement.
 {¶ 7} DiCello advised Newport Harbor that the reason he was having difficulty maneuvering the yacht into his slip was because of the improper placement of the guide poles. DiCello demanded that the guide poles be moved to provide him with a width of twenty-five feet. However, Newport Harbor refused to permit the movement of the guide poles. Edward Lozick, the owner of slip two, also objected on the grounds that moving the guide poles would be an invasion of his space in slip two.
 {¶ 8} On June 21, 2002, at approximately 5:00 o'clock in the morning, DiCello paid an underwater demolition crew to cut down the two guide poles. As a result, on February 28, 2003, Newport Harbor filed an action against DiCello to quiet title and for declaratory judgment. Newport Harbor also requested damages for the destruction of the guide poles. In addition, Newport Harbor joined Lozick as a party to the action to protect his interest in slip two.
 {¶ 9} Lozick filed a cross-claim against DiCello to quiet title for destroying the guide poles and invading slip two. Later, Lozick amended the cross-claim to include specific allegations of trespass.
 {¶ 10} DiCello counterclaimed alleging breach of lease, seeking declaratory judgment, fraud and constructive fraud, trespass, conversion, violation of the consumers sales practice act, and unjust enrichment. DiCello also filed a cross-claim against Lozick alleging that during Lozick's reconfiguration of slips two, the guide poles separating slip two and three were moved. DiCello also cross-claimed against Lozick for trespassing upon slip three.
 {¶ 11} Newport Harbor and Lozick filed motions for summary judgment. On June 30, 2004, the trial court granted in part and denied in part the dispositive motions of Newport Harbor and Lozick. The trial court granted Newport Harbor's motion on its claim that DiCello purposefully and maliciously destroyed its property. The trial court also granted Newport Harbor's motion as to DiCello's counterclaim for fraud and constructive fraud, conversion, violation of the consumers sales practice act, and unjust enrichment.
 {¶ 12} The trial court denied Newport Harbor's motion on its claim to quiet title and for declaratory judgment, and also denied its motion as to DiCello's counterclaim for breach of lease and declaratory judgment, violations of the consumers sales practices act, trespass, and injunctive relief. The trial court denied Lozick's motion in its entirety.
 {¶ 13} The remaining claims were tried to the jury, which determined that the guide poles should be reinstalled where they had previously been. The jury awarded Newport Harbor $10,000 in compensatory damages and $100,000 in punitive damages. The jury also awarded Lozick $2 in compensatory damages for trespass and loss of rent and $15,000 in punitive damages. Further, the jury ruled Newport Harbor and Lozick were entitled to attorney fees. The trial court awarded $66,484.33 in attorney fees to Newport Harbor and $74,062.25 to Lozick.
 Summary Judgment {¶ 14} In his first assigned error, DiCello argues the trial court erred in granting Newport Harbor summary judgment on its claim for purposeful and malicious destruction of property. We agree.
 {¶ 15} We review an appeal from summary judgment under a de novo standard of review.[2] Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.[3] Under Civ.R. 56, summary judgment is appropriate when: (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can reach only one conclusion which is adverse to the non-moving party.[4]
 {¶ 16} The moving party carries an initial burden of setting forth specific facts which demonstrate his or her entitlement to summary judgment.[5] If the movant fails to meet this burden, summary judgment is not appropriate; if the movant does meet this burden, summary judgment will be appropriate only if the non-movant fails to establish the existence of a genuine issue of material fact.[6]
 {¶ 17} The trial court's journal entry pertinent to its grant of summary judgment on the issue of purposeful and malicious destruction of the guide poles reads as follows: "Plaintiff claims that Defendant DiCello purposefully and maliciously destroyed its property and this Court agrees. Defendant DiCello's proper remedy in this instance would have been obtaining a mandatory injunction. See Miller v. W. Carrollton,632 N.E.2d 582. Here Defendant DiCello cannot claim that he acted reasonably, assuming arguendo that the poles encroached on his slip. Therefore, plaintiff is entitled to summary judgment with regard to this issue."[7]
 {¶ 18} The Ohio Supreme Court defines actual malice as follows:
"(1) That state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm."[8]
 {¶ 19} The Ohio Supreme Court further stated: "Actual malice requires consciousness of the near certainty (or otherwise stated `great probability') that substantial harm will be caused by the tortious behavior. Any less callous mental state is insufficient to incur that level of societal outrage necessary to justify an award of punitive damages. Therefore, it is evident that a reckless actor, who only has knowledge of the mere possibility that his or her actions may result in substantial harm, is not behaving maliciously."[9]
 {¶ 20} Because it is difficult to ascertain a tortfeasor's mental state, a finding of actual malice may be inferred from conduct and surrounding circumstances.[10] Applying the above standards to the present case, we believe that DiCello presented sufficient evidence to allow the issue of purposeful and malicious destruction of the guide poles to go to the jury.
 {¶ 21} In the instant case, DiCello's counterclaims were predicated upon facts demonstrating that he was entitled to a boat slip that was eighty feet long and twenty-five feet wide. In fact, the trial court's determination that questions of fact existed as to the width of DiCello's boat slip supported an inference that questions of fact also existed as to DiCello's mental state at the time he cut down the guide poles.
 {¶ 22} The trial court's journal entry pertinent to its denial of summary judgment on Newport Harbor's claim to quiet title and for declaratory judgment reads as follows:
"Plaintiff argues that it is entitled to summary judgment. This Court finds that Plaintiff is not entitled because with regard to this issue, parol evidence is admissible because there is a question of fact as to the width of slip 3. See e.g. Gans v. Andrulis (11th Dist. 1998) 1998 W.L. 258408 (allowing parol evidence to determine width of easement). While the lease in question is unambiguous as to the length of slip 3, there is a question as to the width."[11]
 {¶ 23} A review of the record before us indicates that the Newport Harbor marina is made up of areas consisting of a west side and an east side. The largest slips are one hundred feet in length and twenty-seven feet in width. There are four of these slips; two at each end. The next largest slips are eighty feet in length and twenty-five feet in width. There are also four of these slips; two at each end.[12]
 {¶ 24} As previously noted, DiCello purchased slip three, which is represented in Newport Harbor's disclosure statement as eighty feet in length and twenty-five feet in width. After purchasing his new yacht, which measured eighty feet by twenty feet, DiCello experienced difficulty maneuvering it into the boat slip. Upon measuring his boat slip, DiCello discovered that he did not get the twenty-five feet in width that was represented. However, Newport Harbor posited that DiCello's lease was for only eighty lineal feet. The record before us belies Newport Harbor's position.
 {¶ 25} The President of Newport Harbor Association, George Humphrey, gave the following deposition testimony:
"Q. Now, do you know if DiCello, the width of his slip is 25?
A. Do I know if it is?
Q. Yes.
A. It's not.
Q. It's less, isn't it?
A. Yes."[13]
 {¶ 26} At his deposition, Humphrey was questioned about pre-litigation notes that he made on a letter DiCello sent to Lozick. He stated as follows:
"Q. What was the purpose of your notes?
A. I would say the purpose of my notes is I was always looking to try and find some way to determine what was fair and right and something that could lead to an amicable resolution of the situation instead of a showdown.
Q. Now you have a one that's circled. It says `total dockage 110.' Is that your writing?
A. Yes.
Q. And then you have `102, but we need 104.' What does all that mean?
A. It means there's two feet, two feet of water for Ed Lozick to have 27 footers and Nick DiCello to have 25 and Hal Artz to have 25. And there is not enough water, and that's just on the western side. There is enough on the eastern side, the side you come into the dock on."
* * *
"Q. Then three says `Lozick entitled to 23 feet', and you go on to say `Nick is entitled to 25 feet', right?
A. Right.
Q. But Nick doesn't have 25 feet, correct?
A. Correct."
* * *
"Q. Then you go down to two, you have a two again, and `owners would be entitled to quiet title', would you read that into the record, please?
A. `Owners would be entitled to quiet title and NHA', standing for Newport Harbor Association, `could be liable for their having overpaid taxes and dues for ten years."[14]
 {¶ 27} The record also indicates that despite Newport Harbor's position that DiCello was only entitled to eighty lineal feet, they assessed DiCello's taxes and dues based on square footage of his boat slip. The treasurer of Newport Harbor, Donald Campbell, gave the following deposition testimony:
"Q. How did you determine what he owes on a monthly basis for real estate — is real estate charged on a monthly basis?
A. Yes.
Q. Tell me how you determined that.
A. Determined by taking the square footage — the hypothetical square footage, again.
Q. Let's go to what you are referring to get in your terms the hypothetical square footage, where did you find that?
A. Oh, I found that — it's found in the original documents you see here that you had.
Q. So what was Mr. DiCello's hypothetical length?
A. Length, is 80 feet.
Q. What was his hypothetical width?
A. 25 feet.
Q. And you took that and based on that you developed his — I'm sorry, you determined his pro rata share of the common area maintenance and taxes, correct?
A. Correct. Correct. In his case that number was 2,000 square feet.
Q. How did you get 2,000 square feet?
A. I took 25 times 80."[15]
 {¶ 28} Based on the foregoing, a question of fact exists as to DiCello's state of mind at the time he cut down the guide poles. DiCello could have reasonably believed that he was removing an encroachment on his property. As such, the law holds a high regard for an individual's right to own property and treats harshly those who infringe upon that right.[16] In the absence of some agreement to the contrary, a property owner has no right to encroach on the land of another.[17]
Section I, Article I of the Ohio Constitution provide: "All men are, by nature free and independent and have certain inalienable rights, * * * acquiring, possessing and protecting property * * *." Thus, one may undertake reasonable steps to protect his property or exclude others from its use and enjoyment.[18]
 {¶ 29} Similarly, it is a well-recognized principle of common law that a landowner has the right to protect his own land from threatened injury, even though, in doing so, he produces a condition that injures adjoining land, provided he acts with reasonable care.[19] Ohio has recognized the right of a property owner to use self-help in removing encroachments on his property.[20] Other jurisdictions also recognize the right of an owner to remove any encroachment on his property which deprives him of the complete enjoyment of his land.[21]
 {¶ 30} We conclude, based on the record before us, that a question of fact exists regarding DiCello's state of mind at the time he cut down the guide poles. DiCello could have reasonably believed that the guide poles encroached upon his property, which he could argue deprived him of the complete enjoyment of his property. As there are genuine issues of fact, the trial court erred in granting summary judgment in favor of Newport Harbor on its claim that DiCello purposefully and maliciously destroyed the guide poles. Accordingly, we sustain the first assigned error. We decline to address the remaining assigned errors because of our determination that appellant is entitled to a new trial. Our disposition of DiCello's first assigned error renders the remaining assigned errors moot.[22]
Judgment reversed and remanded for further proceedings consistent with this opinion.
This cause is reversed and remanded.
It is, therefore, ordered that said appellant recover of said appellee its costs herein.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Colleen Conway Cooney, P.J., and Michael J. Corrigan, J.,concur.
[1] A guide pole looks like a telephone pole sticking out of the water. It is used as a mooring device and dock space divider for boats.
[2] Baiko v. Mays (2000), 140 Ohio App.3d 1, citing Smiddyv. The Wedding Party, Inc. (1987), 30 Ohio St.3d 35; NortheastOhio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs. (1997),121 Ohio App.3d 188.
[3] Id. at 192, citing Brown v. Scioto Bd. of Commrs. (1993),87 Ohio App.3d 704.
[4] Temple v. Wean United, Inc. (1997), 50 Ohio St.2d 317,327.
[5] Dresher v. Burt, 75 Ohio St.3d 280, 292-293,1996-Ohio-107.
[6] Id. at 293.
[7] Journal Entry June 30, 2004.
[8] Preston v. Murty (1987), 32 Ohio St.3d 334.
[9] Motorists Mut. Ins. Co. v. Said (1992),63 Ohio St.3d 690, 697, citing Prosser and Keaton, The Law of Torts (5 Ed. 1984) 212-14, Section 34.
[10] See Joyce-Couch v. DeSilva (1991), 77 Ohio App.3d 278,288.
[11] Journal Entry June 30, 2004.
[12] Disclosure Statement For The Development of Newport, A Planned Residential Development in Bratenahl, Ohio. Dated July 25, 1989, Amended January 16, 1990.
[13] Humphrey's Depo. at 39.
[14] Humphrey's Depo. at 46-53.
[15] Campbell's Depo. at 15-16.
[16] Fairman v. Vecchione (Mar. 30, 1984), 11th Dist. No. 3172.
[17] McWilliams v. Horstman (1928), 30 Ohio App. 268; Lichtv. Woertz (1929), 32 Ohio App. 111; McGee v. Randolph (1950), 56 Ohio Law Abs. 24.
[18] See Schoenberger vs. Davis (June 23, 1983), Cuyahoga App. No. 45611 citing Murry v. Heabron (1947), 35 Ohio Op. 135.
[19] Id.
[20] Murry, supra.
[21] People v. Henry (1961), 14 Cal. Rptr. 456; Haitsch v.Duffy (1914), 10 Del. Ch. 280; Burney Bros. Co. v. Happ
(1922), 28 Ga. App. 741; Schwartz v. Atlantic Bldg. Co. (1913),41 App. D.C. 108.
[22] App.R 12(A)(1)(c).